THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MASK OF KA-NEFER-NEFER, )<br>)<br>Defendant. )<br>)<br>_____) | Case No.: 4:11-CV-00504 |

**THE SAINT LOUIS ART MUSEUM'S MOTION TO DISMISS THE
GOVERNMENT'S CIVIL FORFEITURE COMPLAINT**

COMES NOW the Art Museum Subdistrict of the Metropolitan Zoological Park and Museum District of the City of St. Louis and the County of St. Louis ("Museum"), a verified Claimant in this case, and respectfully moves this Court for an Order dismissing the United States Government's Civil Forfeiture Complaint ("Government's Complaint"), as it fails to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Civil Procedure Supplemental Rule G(8)(b), it is time-barred by the applicable statute of limitations, and it is time-barred by the doctrine of laches.  In support of this Motion, the Museum provides the following Memorandum in Support:

**BACKGROUND**

On February 15, 2011, the Museum filed its declaratory judgment complaint against the Government pursuant to Title 28 United States Code, Sections 2201-02, Case No. 4:11-cv-00291 ("Museum's Complaint").  The Museum's Complaint seeks the Court's determination the Government is time-barred from seeking forfeiture of the Mask of Ka-Nefer-Nefer ("Mask") pursuant to 19 U.S.C. §§ 1595a and 1621, and the Court's determination that the Mask was not

"stolen." The Museum filed its declaratory judgment action in the wake of more than five years of repeated yet wholly unsupported claims by an Egyptian antiquities authority that the Mask was stolen, and the Government's adoption of those claims and threat to seize the Mask pursuant to 19 U.S.C. § 1595a.

On March 16, 2011, the Government filed a Motion to Dismiss or Stay ("Government's Motion") the Museum's Complaint, claiming it was filed for the purpose of "forum-shopping" and because it was brought "chiefly to raise an affirmative defense in anticipation of the filing of a coercive suit." *See* Defendant's Memorandum in Support of its Motion to Dismiss or Stay Proceedings, Case No. 4:11-cv-00291 Doc. # 9, at p. 3.  The Government also argued that, as it had just that same day filed a Civil Forfeiture Complaint *in rem* seeking the forfeiture of the Mask, the Museum's Complaint should be dismissed or stayed because the Government's civil forfeiture action is "a superior vehicle for adjudicating the rights at issue because it is capable of resolving the entire controversy between the parties" as well as the "claims of any third parties." *Id.* at p. 1.

The Government concedes in its civil forfeiture complaint that venue is proper in the Eastern Division of the Eastern District of Missouri pursuant to 28 U.S.C. §§ 1355 and 1395 because the Mask is located in St. Louis, Missouri. *See* Verified Complaint for Forfeiture, at ¶6. The Government's Complaint seeks the forfeiture of all rights, title and interests in the Mask on the basis that "the circumstances indicate it was stolen property at the time it was imported into the United States." *Id.* at ¶7.

In support of its theory that the Mask was stolen, the Government alleges the Mask was excavated at Saqqara, Egypt in 1952, placed in storage in Saqqara following its excavation where it remained until 1959, and then was "packed for shipping" to Cairo, Egypt in preparation for an

exhibit in Tokyo, Japan. *Id.* at ¶8-10. The Government further claims the Mask was "received by police guards" in Cairo in July 1959 but, instead of travelling to Tokyo, it remained in Cairo until 1962 when it was transferred back to Saqqara. *Id.* at ¶12-13.

The Government further claims the Mask was removed from Saqqara in 1966 and "traveled" to Cairo in "box number fifty-four," the "last documented location of the Mask in Egypt." *Id.* at ¶14-15. The Government does not allege the Mask was received in Cairo and, if so, when and by whom, and does not allege what happened to the Mask after it was allegedly placed in box number fifty-four. The Government only alleges that in 1973, an inventory was taken of box number fifty-four, whereupon it was discovered the Mask was "missing." *Id.* at ¶¶16-17.

The Government also does not allege when the Mask was stolen, the circumstances under which it was stolen, the location from which it was stolen, the person or persons who may have stolen the Mask, whether there was any law enforcement investigation of the "theft," nor does it suggest any reason for the thirty-three year delay between discovery of the "theft" and the report of the "theft" to any law enforcement organization, art loss registry, or governmental authority. The Government relies solely on the fact that "the register did not document that the Mask was sold or given to a private party during the time frame of 1966 to 1973" to suggest the Mask was stolen at all. *Id.* at ¶18. The U.S. Government does not allege that all sales or gifts of antiquities by the Egyptian government prior to 1983 were documented or registered.

To date, no Verified Claims to the Mask have been filed except for the Museum's Verified Claim to the Mask filed on April 20, 2011. In fact, the only other possible claimant to the Mask would be the Republic of Egypt, on whose behalf the Government will act if the Museum's declaratory judgment action is allowed to proceed.

KCP-4117978-4

3

## **LEGAL ARGUMENT**

I.   **The Government's Complaint Must Be Dismissed Because It Fails Pursuant to Fed. R. Civ. P. Supp. R. G(2) to Sufficiently Plead Facts to Support a Reasonable Belief the Mask was Stolen**

When ruling on a Fed. R. Civ. P. 12(b)(2) motion to dismiss a civil forfeiture complaint, which a claimant may file pursuant to Fed. R. Civ. P. Supp. R. G(8)(b), the court must accept well-plead facts as true and draw reasonable inferences in favor of the non-moving party. *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009). However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim. *Mattes v. ABC Plastics, Inc.*, 232 F.3d 695, 698 (8th Cir. 2003). The Government must assert facts that affirmatively and plausibly suggest its right of action, rather than facts that are merely consistent. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A civil forfeiture complaint must be dismissed if the government fails to sufficiently plead facts to support a reasonable belief that it can demonstrate its burden of proof at trial. Fed. R. Civ. P. Supp. R. G(2). At trial, the government must prove by a preponderance of the evidence that the defendant property is subject to forfeiture. 18 U.S.C. § 983(c)(1). To be subject to forfeiture under 19 U.S.C. § 1595a and the Government's Complaint, the Government must prove at trial by a preponderance of the evidence that the Mask was stolen. *See* 19 U.S.C. § 1595a. Thus, the Government's Complaint must contain sufficient detailed facts to support a reasonable belief that the Government will be able to show the Mask was stolen. *See* Fed. R. Civ. P. Supp. R. G(2).

Because the Government is basing its civil forfeiture action on an allegation that the Mask is stolen, the Government must establish that the Mask is indeed stolen. In other words, there must be an underlying basis for the civil forfeiture action. 19 U.S.C. § 1595a provides that

the Mask must have been "introduced or attempted to be introduced into the United States *contrary to law . . . .*" 19 U.S.C. § 1595a(c) (emphasis added).  The Government's complaint, however, does not even allege the law under which the Mask is considered stolen.

Two of the critical questions in determining whether the Mask was "stolen" are whether a) Egyptian antiquities law at the time of the alleged theft constituted a national declaration of ownership of such objects and b) whether there was an illegal export of the item.  *See U.S. v. McClain*, 545 F.2d 988, 1000-01 (5th Cir. 1977).[1]  In *McClain*, the Fifth Circuit acknowledged that the impact of an export restriction is far different from that of a national declaration of ownership, the former being a matter of sovereign policy enforceable (in the absence of a treaty or other agreement) by the sovereign itself and not by the United States, whereas the latter constitutes true ownership, the first generally recognized element of theft under the National Stolen Property Act ("NSPA").[2]  *See id.* at 994.  Determining whether there was a national declaration of ownership of the Mask requires an analysis of the relevant Egyptian law at the time of the alleged theft, a task made somewhat more difficult by the fact there is no allegation as to when the Mask was "stolen."

Some elements are clear.  First, it is reasonable to assume the Government alleges the Mask left Egypt between the time it was excavated (1952) and the time it was discovered to be missing (1973).  A long series of Egyptian antiquities statutes, ordinances and decrees has addressed the character and treatment of items defined as antiquities, the majority of them

---

[1] Notably, *McClain* was a criminal case brought under the National Stolen Property Act, 18 U.S.C. §2314, not a forfeiture action brought pursuant to the Tariff Act.

[2] The others being a taking without permission of the owner, with the intent to permanently deprive the owner of the object. *McClain*, 545 F.2d at 993-94.

5

specifically directed at the exportation of antiquities.[3]  However, the most significant Egyptian statute, and the only one recognized by American courts as a true ownership law, is Egyptian Law No. 117, enacted in 1983.  *United States v. Schultz*, 333 F.3d 393, 402 (2d Cir. 2003).

In *Schultz*, the Second Circuit considered the conviction of the defendant pursuant to the NSPA in connection with the receipt of Egyptian antiquities the Government alleged were owned by the Egyptian government.  In doing so, the Court reviewed the Rule 26.1 evidentiary hearing conducted by the district court to address the question whether Law 117 established Egypt's ownership of the antiquities.  *Id*. at 400.  In determining whether Law 117 constituted a benchmark in Egyptian antiquities law, the Second Circuit carefully set out the expert testimony adduced by the Government, which notably included testimony that after the enactment of Law 117 "people who owned antiquities prior to the adoption of Law 117 in 1983 are permitted to continue to possess the antiquities, but they may not transfer, dispose of, or relocate the antiquities without notifying the Egyptian government."[4]  *Id.*  The Court noted that "Egyptian government officials testified that there was no legal way for a private individual to retain possession of an antiquity discovered after 1983" in recognizing that "Law 117 makes it clear that the Egyptian government claims ownership of all antiquities found in Egypt after 1983." *Id*. at 401-02.  Thus, in dealing with the issue of ownership, the Second Circuit recognized that 1983 was the point after which the Egyptian government owns antiquities discovered in Egypt.  The Court recognized that the laws prior to Law 117 allowed private ownership of antiquities.  Until

---

[3] *See*, e.g., Decree of April 15, 1950 Imposing an Export Duty on Antiquities, Decree No. 9816 of December 18, 1950 Imposing Duties Related to Sealing Boxes or Parcels of Antiquities for Export, Decree No. 10613 of March 6, 1952 Regulating Commerce in Antiquities, Decree No. 10614 of March 6, 1952 Regulating the Exportation of Antiquities.

[4] This is a reference to Article 18 of Law 215, which provides, in pertinent part, that "the owner of an antiquity must advise the Minister of Education and Teaching of any act of disposition or related act by him, within fifteen days from the date of the act."

1983, there was no Egyptian statute declaring state ownership of all antiquities of the type that includes the Mask.  *Id*.

The Government also alleges that the Mask was "registered as the property of the Egyptian Antiquities Service" shortly after it was discovered.[5]  *See* Verified Complaint for Forfeiture at ¶ 9.  The Complaint does not attempt to explain or suggest that "registration" establishes ownership or carries with it any legal claim to ownership.  In fact, it does not because there is no "registration" requirement in Law 215 for objects like the Mask.  Indeed, Law 215, Article 5 expressly permits the Egyptian government to "exchange moveable antiquities found in duplicate, with museums and private owners, and Article 22 of Law 215 recognizes private ownership of antiquities sold or gifted by the Egyptian government. As the Government has failed to cite authority for any registration requirement, it is reasonable to assume that the "registration" the Government refers to in its Complaint is the requirement that "individuals in possession of antiquities shall notify the [Egyptian] Antiquities Authority of the antiquities in their possession within six months of [the implementation] of this law and shall safeguard them until they are registered by the Authority. . . . Anyone who fails to declare [antiquities] within the aforementioned period of time . . . shall be deemed to be an unlawful possessor."  However, this requirement is contained in Article 8 of Law 117, enacted in 1983, more than thirty years after the Mask was discovered and more than ten years after it was discovered "missing."  There was no such requirement applicable to the Mask before 1983.

In short, the reason that the Government fails to clearly plead the basis on which the court should conclude that the Mask must be stolen is that there is no basis for such a conclusion.

---

[5] In fact, there is no "Egyptian Antiquities Service" and never has been; the current Supreme Council of Antiquities is the successor to the Department of Antiquities, having been so titled in 1971.

KCP-4117978-4

Instead, the Government relies only on "conclusory allegations of law" and "unwarranted inferences."

Despite this, the Government offers only that the Mask was missing in 1973 and that the "register did not document that the Mask was sold or given to a private party," suggesting that these two facts establish a theft.  *See* Verified Complaint for Forfeiture at ¶18.  The closest the Government comes in its Complaint to a plain statement that the Mask was stolen are the conclusory allegations that a) the Mask was in Egypt possibly as late as 1966, b) it was discovered not to be in Egypt's possession in 1973, and c) that the Supreme Council of Antiquities learned that it was in St. Louis in 2006.  Contrary to the Government's suggestion and regardless of whether the Mask left Egypt in 1952, 1966 or 1973, it was not, as the Second Circuit has recognized, owned by Egypt as a matter of law.  *See Schultz* 333 F.3d  at 401-02.

The essence of the Government's argument is that the Mask was excavated in Egypt and somehow ended up in St. Louis, and the simple fact of the Mask's presence in St. Louis must mean the Mask was stolen from Egypt.  These facts fall far short of giving rise to a reasonable belief the Government will be able to establish at trial there is probable cause the Mask was stolen.  At a fundamental level there can be no theft in this case because the Government fails in the first instance to establish Egypt's ownership of the Mask, by statute or by claim.  As such, it wholly fails to meet its obligation to "sufficiently plead facts to support a reasonable belief that it can demonstrate its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2).   Accordingly, this Court should dismiss this case.

## II. The Government's Action is Barred by the Applicable Statute of Limitations

The Government's Complaint should also be dismissed because it was filed outside of the applicable limitations period.  The statute of limitations applicable to a 19 U.S.C. §1595a civil

forfeiture claim is 19 U.S.C. § 1621. 19 U.S.C. § 1621 provides any action for forfeiture pursuant to the search and forfeiture provisions of 19 U.S.C. § 1595a must be commenced within five-years after the time when the alleged offense is discovered. Lawsuits filed outside of that period are time-barred and therefore must be dismissed.

Courts have interpreted the date the alleged offense is discovered to mean the date when the United States Government was aware of facts that should have triggered an investigation leading to discovery of the offense. *See U.S. v. Twenty-Seven Parcels of Real Prop. Located in Sikeston, Scott Cnty., Mo.*, 236 F.3d 438, 441 (8th Cir. 2001). The Eighth Circuit, as well as other federal courts, holds constructive knowledge is sufficient to trigger the running of the limitations period provided in 19 U.S.C. § 1621. *See U.S. v. Premises Known as 318 South Third Street, Minneapolis, Minn., Hennepin Cnty.*, 988 F.2d 822, 826 (8th Cir. 1993); *see also Santana v. U.S. Customs Serv.*, 972 F. Supp. 304, 306 (M.D. Pa. 1997) (interpreting *Premises Known as 318 South Third Street* as holding Section 19 U.S.C. § 1621 to require either constructive or actual knowledge).

Although the Eighth Circuit has not expounded upon when constructive knowledge will be imputed to the Government, other courts hold constructive knowledge will be imputed when the Government "discovers or possesses the means to discover the alleged wrong, whichever comes first." *U.S. v. Shabahang Persian Carpets, Ltd.*, 926 F. Supp. 123, 126 (E.D. Wis. 1996); *U.S. v. $116,000.00 in U.S. Currency*, 721 F. Supp. 701, 703-04 (D. N.J. 1989); *U.S. v. R.I.TA. Organics*, 487 F. Supp.75, 78 (N.D. Ill. 1980) *citing U.S. v. $116,000.00 in U.S. Currency*, 721 F.Supp.701, 703-04 (D. N.J. 1989).

The Government's Complaint itself claims Egyptian authorities had sufficient knowledge as early as 1973, when it was allegedly discovered the Mask was missing from box number fifty-

four, to determine the Mask was stolen from Egypt. At that point, the Egyptian authorities should have begun an investigation into the whereabouts of the Mask, including an inquiry with and listing of the Mask with the various international art loss registers. Had the Egyptian authorities taken these moderate and reasonable steps to determine what had become of the Mask, it is entirely reasonable to believe the U.S. Government would have had sufficient knowledge as early as 1973 and as late as the date the Museum imported the Mask in 1998, triggering its obligation to investigate the Mask. Instead, the U.S. Government's position is that for over eighteen years – until 2006 - Egyptian authorities did nothing to find a Mask they determined was missing in 1973. Neither the Egyptian authorities, nor the U.S. Government, should be allowed to benefit from Egypt's negligence in determining the Mask's whereabouts.

Even though Egypt's negligence or apathy or both is inexcusable, it cannot be imputed to the U.S. Government. But the U.S. Government was itself, on numerous occasions and over the course of several years, directly provided with information that both separately and cumulatively gave the Government the "means to discover the alleged wrong." A detailed timeline of the date and substance of various communications to the U.S. Government sufficient to trigger the running of the statute of limitations is as follows:

1.  As part of the Museum's provenance investigation, in or around late-October 1997, the Museum arranged for a package containing the description of the Mask, photos, and a letter explaining the Museum's intention to purchase the Mask to be hand-delivered to Dr. Mohamed Saleh, Director of the Museum of Egyptian Antiquities[6] in Cairo, Egypt, inquiring about the Mask.

---

[6] The Museum of Egyptian Antiquities, also referred to as the Egyptian Museum, was established by the Egyptian government in 1835 as the national repository for Egyptian artifacts. It houses the largest collection of Egyptian antiquities in the world. The Government alleges that the Mask was sent to the Egyptian Museum on at least two occasions.

KCP-4117978-4

2.      Thereafter, on or about February 16, 1998, counsel for the Museum sent identical letters and photographs of the Mask to the Art Loss Register ("ALR"), INTERPOL, and the International Foundation for Art Research ("IFAR") advising these institutions that the Museum was considering purchasing the Mask and requesting confirmation the Mask was not listed in their respective databases of stolen art.  Counsel for the Museum received a letter from R.E. Kendall, Secretary General of INTERPOL on or about February 23, 1998, advising that the Museum's request had been forwarded to the U. S. Department of Justice's National Central Bureau, in Washington, DC, for "action they may deem necessary."  See Exhibit A, attached.

3.      On December 31, 2005, Ton Cremers ("Cremers"), operator of the Amsterdam based Museum Security Network,[7] sent an e-mail to the Museum and several United States government officials, including Bonnie Magness-Gardiner ("Magness-Gardiner"), the manager of the Federal Bureau of Investigation's ("FBI's") Art Theft Program.[8] See Exhibit B, attached. As the name suggests, the Art Theft Program is the federal government's primary law enforcement entity for the investigation and prosecution of art theft and "cultural property crimes."  In his e-mail, Cremers repeatedly asserts the Mask was stolen and believed to be in the possession of the Museum, stating "the Saint Louis Art Museum possibly has an Egyptian mask that was stolen circa 15 years ago from the depositories of a museum in Saqqara, Egypt," and "SLAM possesses an antiquity stolen from a museum in Egypt."

---

[7] The Museum Security Network mailing list is a significant channel for the distribution of news and information pertaining to cultural property protection, preservation, conservation, and security. On a daily basis, information is posted on www.museum-security.org as well as on the MSN Google Group. Subscribers include museum professionals, law enforcement officers, lawyers, academics, insurance underwriters, journalists, auction houses, among many others. *See* http://www.museum-security.org/

[8] Cremers sent the December 31, 2005, email to two individuals with @leo.gov email addresses.  LEO stands for the Law Enforcement Organization, which is an on-line database for law enforcement agencies.  One of these addresses was bmagness@leo.gov, which, upon information and belief, is an email address for Bonnie Magness-Gardiner of the FBI.

KCP-4117978-4

4. On January 4, 2006, Cremers sent another email directly to Magness-Gardiner asking for the FBI's assistance regarding the Mask's provenance, and re-asserting that the Mask was "stolen from the depositories in a museum in Saqqara, and that supposedly [sic] is in the collection of the Saint Louis Art Museum."  Thereafter, Cremers sent a series of emails to individuals at INTERPOL stating that he has shared information regarding the Mask's provenance with the FBI.  See Exhibit C, attached.

5. On January 13, 2006, Cremers sent an email to the Museum with the subject "(Fwd) RE: TR: STOLEN EGYPTIAN MASK IN AMERICAN MUSEUM."  See Exhibit D, attached.  This email was a forward of several emails Cremers had sent on January 12 and 13, 2006, to several United States government officials including: Special Agent James McAndrew ("McAndrew") at the United States Department of Homeland Security ("DHS"), and Magness-Gardiner.  In the forwarded emails, Cremers again alleges the Mask was stolen and in the Museum's possession, offering the following statements:

    a. "So I should think that if the Egyptian Government lodged a complaint or request with the USA Government and the FBI Crime Team (to which I am copying this), then the Museum would be obliged to answer the questions."

    b. "The FBI is just waiting for Egypt to file a complaint.  A [sic] soon as Egypt files a complaint [sic] the FBI is expected to act."

    c. "Maarten Raven, a Dutch archaeologist, saw the mask in the [sic] Saqqara and . . . is VERY positive that the mask in the SLAM [Museum] is the same as the one stolen in Saqqara . . . ."

6. Between February 14, 2006 and continuing through 2007, the Museum received several letters from Dr. Zahi Hawass ("Hawass"), Secretary General of the Supreme Council of

Antiquities for the Ministry of Culture, Cairo, Egypt ("SCA"), as well as an attorney claiming to represent the SCA, suggesting the Mask was stolen from Egypt, demanding its return, and threatening legal action against the Museum:

a. On February 14, 2006, the Museum received the first of several letters from Hawass regarding the Mask's provenance and stating the Museum had two weeks to begin the process of returning the Mask to Egypt; otherwise, Hawass stated he would contact INTERPOL and start legal proceedings. Hawass's letters contained numerous inaccuracies and inconsistencies, leading the Museum to make repeated requests for clarification, and for which Hawass refused to provide many relevant documents. The Museum responded to Hawass's letter on the same day it was received, February 14, 2006, by disputing Hawass's allegations and expressing its willingness to investigate any supporting materials provided by the Egyptian authorities.

b. On March 10, 2006, the *Al-Ahram Weekly* published an article on the Internet regarding the Mask's provenance and Hawass's claim that the Mask was stolen.

c. On October 11, 2006, Hawass sent his tenth letter to the Museum, this time requesting additional documentation from the Museum supporting the Museum's determination of the Mask's provenance. On December 22, 2006, the Museum responded by sending the requested documentation with a summary of the Museum's due diligence efforts to determine the Mask's provenance.

Thus, as early as February 16, 1998, when the United States Department of Justice received from INTERPOL the Museum's letter specifically advising of the Museum's interest in purchasing the Mask and inquiring as to whether the Mask was "stolen or illicit," the United

States Government possessed actual or constructive knowledge that should have triggered an inquiry as to the Mask's ownership.

At the latest, the Government had actual or constructive knowledge the Mask was alleged to be stolen on January 4, 2006, when Cremers sent Magness-Gardiner, manager of the FBI's Art Theft Program, and her colleagues[9], an email alleging that the Mask was stolen and in the Museum's possession.  Accordingly, well over five years prior to the date the Government filed its civil forfeiture complaint, it possessed an abundance of information sufficient to trigger its obligation to seek forfeiture of the Mask if it determined that a basis for such an action existed. The Government chose not to act until it moved to dismiss the Museum's declaratory judgment action on March 16, 2011, and, pursuant to the applicable statute of limitations, 19 U.S.C. § 1621, this action is time-barred and should be dismissed.

### III.     The Government's Action is Barred by the Doctrine of Laches

The Government's Complaint should also be dismissed because it is time-barred by the doctrine of laches.  Laches precludes a lawsuit when the plaintiff's lack of diligence results in prejudice to the party asserting the defense.  *Baker v. Baker*, 951 F.2d 922, 926 (8th Cir. 1991). The doctrine of laches recognizes the necessity for "speedy vindication or enforcement of rights" and "is based upon considerations of public policy, which require for the peace of society the discouragement of stale demands." *Alligood v. U.S.*, 14 Cl. Ct. 11, 15 (1987).

As an equitable doctrine, laches "differs from the statute of imitations in that it offers the courts more flexibility, eschewing mechanical rules." *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 79 (3d Cir. 1986); *see also Galliher v. Cadwell*, 145 U.S. 368, 373, 12 S. Ct. 873, 36 L. Ed. 738 (1892) ("[L]aches is not, like limitation, a mere matter of time, but principally a question

---

[9] Including St. Louis FBI Special Agent Frank Brostrom, then the regional coordinator of the FBI's Art Crime Task Force.

of the inequity of permitting the claim to be enforced . . . .")  Also unlike the statute of limitations defense, laches is "personal to the particular party[,] . . . must have flexibility in its application[, and a] court must look at all of the particular facts and circumstances . . . and weigh the equities of the parties."  *A.C. Aukerman Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992); *see also Cornetta v. U.S.*, 851 F.2d 1372, 1379 (Fed. Cir. 1988) ("The general rule is that laches . . . must be considered in light of the facts of each case.").

As a remedy founded in equity, there "are no predetermined exact boundaries to the length of time that are considered unreasonable by the curt and sufficient to support a laches defense."  960 F.3d at 1032 ("The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances.").  Ultimately, application of laches "is committed to the sound discretion of the district court."  *Id.* at 1032.

In this case, the doctrine of laches dictates that the Government's Complaint should be dismissed for many of the same reasons it is time-barred by the applicable statute of limitations.  The negligence of the Egyptian authorities aside, the U.S. Government possessed sufficient knowledge as early as 1998 and as late as 2006 to trigger its investigation of the Mask.  Yet, the Government did nothing until 2011.  Now, some fifty-nine years after the Mask was excavated, thirty-eight years after the Mask was discovered missing, thirteen years from the Museum's provenance investigation and purchase of the Mask, and in the wake of regime change and rampant looting of the very Egyptian Museum where the Mask would reside, the U.S. Government seeks to strip the Museum of a Mask it investigated, paid for, published in various popular and scholarly periodicals, and proudly and publically exhibited based only on hollow and utterly unsupported claims.  And all the while that Egypt and the U.S. Government have failed to act, the decades long diminution of documentary and testimonial evidence that has

occurred is insurmountable. Ironically, the Government now seeks to make the most of the dearth of evidence by using a burden-shifting statute to suggest that the absence of evidence is the Museum's problem to surmount if it is to keep the Mask; that if the Museum cannot prove the Mask wasn't stolen, then it should be forfeited. This loss of evidence is unduly prejudicial to the Museum and significantly hinders the Museum's ability to defend against the Government's unsubstantiated claim the Mask was stolen. *Baker,* 951 F.2d at 927.

As such, the doctrine of laches requires that the Government's Complaint should be dismissed due to the Government's delay in bringing this action and the prejudicial impact such delay has had on the Museum.

## ORAL ARGUMENT

The Museum respectfully requests a hearing on the matters raised in this Motion, at a time and date set by this Court.

## CONCLUSION

The Government's Complaint should be dismissed for failure to state a claim the Mask was stolen pursuant to Fed. R. Civ. P. 12(b)(2), Fed. R. Civ. P. Supp. R. G(8)(b), Fed. R. Civ. P. Supp. R. G(2), and Egyptian Law No. 215, and for failure to timely file pursuant to the applicable statute of limitations pursuant to 19 U.S.C. § 1621 and/or the doctrine of laches. On these bases, the Museum respectfully requests an Order from this Court, dismissing the Government's civil forfeiture action with prejudice. A proposed order is attached hereto for the Court's convenience.

Respectfully Submitted,


/s/ Patrick A. McInerney
Patrick A. McInerney          MO# 37638
McClain E. Bryant           MO# 60127
**HUSCH BLACKWELL LLP**
4801 Main St, Suite 1000
Kansas City, MO 64112
pat.mcinerney@huschblackwell.com
mcclain.bryant@huschblackwell.com
816.983.8000 (phone)
816.983.8080 (fax)

*ATTORNEYS FOR THE SAINT LOUIS ART MUSEUM*

**CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that on May 4, 2011, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

                       /s/ Patrick A. McInerney_____
                       Patrick A. McInerney, MO #37638
                       Attorney for Plaintiff Saint Louis Art Museum