UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:11-cv-00504 HEA |
| ) | |
| MASK OF KA-NEFER-NEFER, ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendant. ) | |

## FIRST AMENDED VERIFIED COMPLAINT FOR FORFEITURE

COMES NOW Plaintiff the United States of America, by and through its attorneys, Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and Richard E. Finneran, Assistant United States Attorney for said district, and for its First Amended Verified Complaint for Forfeiture states as follows:

### NATURE OF THE ACTION

1.  This is a civil action brought by the United States, pursuant to 19 U.S.C. § 1595a, seeking forfeiture of all right, title, and interest in an artifact known as the Mask of Ka-Nefer-Nefer (the "Mask"), currently located in Gallery 130 of the St. Louis Art Museum (the "Museum"), One Fine Arts Drive, St. Louis, Missouri 63110. The Mask is currently the subject of a restraining order entered in the instant case on March 16, 2011.

2.  The Mask is described as an artifact of Egyptian origin, measuring approximately 21 and 1/16 inches by 14 and 9/16 inches by 9 and 3/4 inches, and depicting the face, torso, and arms of an Egyptian woman. The Mask is made of plaster, linen, wood, and resin, and painted, gilded, and inlaid with colored glass. Two photographs of the Mask, taken from the Museum's website, are

1

attached hereto as **Exhibits 1** and **2** and incorporated herein by reference.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

4. This Court has jurisdiction over the parties pursuant to 28 U.S.C. §§ 1345 and 1355 because this is proceeding for forfeiture, and because it has been brought by the United States.

5. Venue is placed in the Eastern District of Missouri pursuant to 28 U.S.C. §§ 1355 and 1395 because the defendant Mask is located in the Eastern District of Missouri.

## BASIS FOR FORFEITURE

6. The Mask is subject to forfeiture because the circumstances indicate it was stolen property at the time it was imported into the United States, as set forth in detail below.

*The Illicit Antiquities Market*

7. The illicit antiquities market is a black market for the sale and purchase of ancient artifacts that are stolen, smuggled, or otherwise lacking a legitimate "provenance."

8. The "provenance" of an artifact is a chronological history of its ownership from the time of its origin or discovery to the present, i.e., its "chain of title."

9. Because of the need to verify both that an artifact is authentic and that the seller holds good title to the artifact, it is the ordinary and good practice of buyers of antiquities to require that the sellers provide an account of the artifact's provenance.

10. It is also the ordinary and good practice of buyers of antiquities to independently verify the truthfulness of the provenance provided by the seller.

11. For that same reason, it is the common practice of dealers in the illicit antiquities

2

market to falsify, or launder, the provenance of an artifact in order to conceal the true history of the artifact's ownership.

12. Laundering the provenance of an artifact involves creating a fictitious history of the artifact's ownership through the fabrication of documents or other accounts that misstate of the place or time of origin or discovery or falsely describe the transactions leading to its present ownership.

13. A provenance may be laundered by a technique known as "triangulation," whereby the original illicit ownership of an artifact is concealed by inventing one or more intervening owners who claim to have obtained clear title from the original owner, which original owner may be deceased, unknown, or otherwise unable to confirm his or her prior ownership.

14. A laundered provenance generally lacks official documentation that is capable of independent verification, such as export or import licenses and related documentation from the country of origin and the countries through which it has allegedly traveled.

15. Buyers who purchase an artifact that lacks a complete and verifiable provenance assume the risk that the seller cannot pass clear title and that the buyer's claim of ownership will therefore be subject to challenge.

*The True Provenance of the Mask*

16. In 1952, Egyptian archaeologist Mohamed Zakaria Goneim, working for the Egyptian Antiquities Service, excavated the mat burial of a 19th Dynasty noblewoman named Ka-Nefer-Nefer inside the funerary enclosure of the Third Dynasty King Sekhemket at Saqqara.

17. The Mask was placed in storage in the Sekhemkhet magazine, also located at Saqqara, where it was registered as the property of the Egyptian Antiquities Service and where it remained until 1959.

18. In July of 1959, the Mask and four other items from Saqqara were packed for shipping to the Egyptian Museum in Cairo in preparation for an exhibit in Tokyo.

19. The packing list identified the Mask as registration number 6119 and packed in box number six.

20. The Mask was received by police guards at the Egyptian Museum in Cairo on July 28, 1959.

21. Ultimately, the Mask did not travel to Tokyo for the exhibit. The Mask remained in Cairo, Egypt until 1962 at which time the Mask was transferred back to Saqqara.

22. In 1966, the Mask and other objects from the same burial assemblage were removed from packaging in Saqqara and given to the Egyptian Antiquities Organization Restoration Lab located in Cairo in preparation for future display.

23. The Mask traveled to Cairo from Saqqara in box number fifty-four. This was the last documented location of the Mask in Egypt.

24. In 1973, the Egyptian Museum in Cairo took an inventory of all the objects that traveled in 1966 from Saqqara to Cairo in box number fifty-four.

25. It was discovered at that time that the Mask was missing.

26. The register did not document that the Mask was sold or given to a private party during the time frame of 1966 to 1973, and the Republic of Egypt did not authorize any person to remove the Mask from box number fifty-four at Saqqara during that time period.

27. There is probable cause to believe that the Mask was stolen by an unidentified individual from box number fifty-four at Saqqara between 1966 and 1973.

*Egyptian Law*

28. The Egyptian law that creates Egypt's ownership interest in the Mask is Law No. 215, passed in 1951, the year before the Mask was excavated.

29. Article 1 of Law No. 215 defines "antiquities" to include all objects produced by the arts, science, literature, religions, and customs of Egypt from prehistoric times to the end of the reign of Ismail (circa A.D. 1879).

30. The Mask therefore is an "antiquity" under Law No. 215.

31. Articles 4 and 22 of that law expressly provide that all such "antiquities" are the property of Egypt and are not subject to private ownership, subject only to limited exceptions.

32. Article 22 of Law No. 215 provides that an "antiquity" may be privately owned if (1) it was privately owned at the time of the law's enactment; (2) it was given to the discoverer by the state as partage; (3) it was given away or sold by the state; (4) it was imported into Egypt; (5) it dates from Christian times and is registered but not claimed by the state; or (6) it was accessioned by an Egyptian museum.

33. The Mask was not privately owned at the time of the law's enactment, as it had not yet been excavated.

34. The Mask was not given to the discoverer as partage.

35. In fact, the discover of the Mask, Mohamed Zakaria Goneim, in his 1956 book *The Buried Pyramid*, thanked the Egyptian Department of Antiquities "for permission to reproduce" a photograph of the Mask.

36. At no time was the Mask given away or sold by the Republic of Egypt.

37. The Mask was not imported into Egypt, as it was discovered at Saqqara in 1951.

38. The Mask does not date from Christian times, but instead from the 12th century B.C.

39. The Mask was not sold by any Egyptian museum.

40. As such, none of the exceptions in Article 22 applies to the Mask, and therefore private ownership of the Mask is illegal under Egyptian law.

41. Article 26 of Law No. 215 also provided that "antiquities" could not be exported without a license from the Egyptian government.

42. Decree No. 10614 of March 6, 1952 established additional conditions for the export of "antiquities," including a provision requiring that an official application be made stating the personal information of the exporter and a description of all objects to be exported before a permit could be issued.

43. There is no record indicating that the Mask was ever lawfully exported from Egypt, that application was ever made for its export, or that a permit was ever issued to authorize its export.

44. Articles 29 and 30 of Law No. 215 make it a criminal offense to steal an "antiquity" from a museum, warehouse, or state building, or to appropriate such an antiquity without a license from the Egyptian government.

*The Purchase and Importation of the Mask*

45. In or around March 30, 1998, the Mask was sold to the Saint Louis Art Museum located in Saint Louis, Missouri, by Phoenix Ancient Art, S.A. ("Phoenix"), for the approximate sum of $499,000.00.

46. In its Agreement for the purchase of the Mask, the Museum agreed to pay the purchase price to Phoenix by "check hand-delivered by Museum's Counsel in Switzerland upon receipt of all of the Seller's documents required by Section 5.2 of this Agreement."

47. Section 5.2 of the Agreement provided that Phoenix would provide "a copy of the applicable export and import licenses required by the laws of Switzerland and the United States of America for export of the Mask from Switzerland and import of the Mask into the United States."

48. On information and belief, no such import and export licenses were provided to the Museum by Phoenix as called for in the Agreement, because no such licenses exist.

49. Phoenix also represented in the Agreement that it would warrant and defend the good and marketable title of the Mask against any claim by any other party of any interest in the Mask.

50. The Museum also agreed that it would keep Phoenix's "source for the Mask" confidential for a period of three years after execution of the Agreement.

51. A copy of the Agreement is attached hereto as **Exhibit 3** and incorporated herein by this reference.

52. Because the Mask was stolen, it could not have been lawfully exported from Egypt or lawfully imported into the United States.

*The Sellers of the Mask*

53. Phoenix is now and was at the time of the Mask's importation a company operated by Ali and Hicham Aboutaam.

54. In 2004, Ali Aboutaam was convicted *in absentia* in Egypt for smuggling artifacts out of the country.

55. Also in 2004, Hicham Aboutaam was convicted of smuggling an Egyptian artifact into the United States.

56. At the time they imported the Mask into the United States, the Aboutaams were aware of the controlling provisions of Egyptian law, including, without limitation, that, subject to limited

7

exceptions, any artifact excavated after 1951 was the property of the Republic of Egypt and that the export of any such item from Egypt required that a license be obtained.

57. At the time they imported the Mask into the United States, the Aboutaams either knew or were willfully blind to the fact that no such license existed for the Mask.

58. At the time they imported the Mask into the United States, the Aboutaams either knew or were willfully blind to the fact that Egypt was the true owner of the Mask.

59. At the time they imported the Mask into the United States, the Aboutaams either knew or were willfully blind to the fact that none of the conditions for private ownership of the Mask under Egyptian law had been satisfied.

60. At the time they imported the Mask into the United States, the Aboutaams either knew or were willfully blind to the fact that the Mask had been stolen from Egypt.

*The Museum's Investigation*

61. Prior to acquiring the Mask in 1998, the Museum purportedly engaged in its own investigation of the Mask's provenance.

62. According to the provenance provided to the Museum by Phoenix, the Mask was held by an "unknown dealer" in Brussels, Belgium within a year after its excavation.

63. The Museum never identified the "unknown dealer" or obtained any explanation of how any such "unknown dealer" would have come to have good title to the Mask.

64. According to Phoenix's provenance, the Mask was purchased from the "Kaloterna" private collection in the "1960s" by a Swiss collector named Zuzi Jelinek, who then sold the Mask to Phoenix "by 1997."

65. The Museum never contacted any representative of the Kaloterna private collection,

did not otherwise confirm the family's ownership of the Mask during the 1960s, and did not identify or contact the party who allegedly sold the Mask to the Kaloternas.

66. The Museum never contacted Ms. Jelinek, did not otherwise confirm her ownership during the 1960s, and did not verify the sale of the Mask to Jelinek by the Kaloternas.

67. The provenance provided to the Museum by Phoenix had been falsified in order to launder the true history of the Mask's ownership.

68. Had the Museum merely contacted the Supreme Council of Antiquities of the Republic of Egypt and requested information relating to the provenance of the Mask, it would have known that the provenance provided by Phoenix was plainly contradicted by Egypt's records with respect to the origin and disposition of the Mask.

69. Instead, the Museum avoided contacting sources who could verify the Mask's provenance and instead made only *pro forma* inquiries to various law enforcement agencies and private organizations.

70. As part of its investigation, the Museum contacted the Art Loss Register to determine whether the Mask had been registered as a stolen artifact.

71. At the time it contacted the Art Loss Register, the Museum knew that the Mask had been excavated by Mohamed Goneim in 1952.

72. The Museum's letters, however, only provided a photograph of the Mask and an estimated date of origin, and it did not provide any other description by which it could be identified as having been excavated at a certain time or place or by a certain person.

73. While the Art Loss Register responded that the Mask had not been so registered, its letter also reminded the Museum that its database "does not include items which may have been

illegally exported" and "not every theft is necessarily reported to us."

74. Also as part of its investigation, the Museum sent substantially identical letters to the Missouri Highway Patrol, the International Federation of Art Research, and Interpol to inquire whether the Mask was known to them to be stolen.

75. The Museum did not receive any response to these inquiries indicating either that the Mask was stolen or that it was not stolen.

76. As part of its investigation, the Museum also contacted Dr. Mohamed Saleh, Director of the Egyptian Museum and inquired generally about the Mask.

77. The Museum did not provide a complete provenance for the Mask nor did it request that Dr. Saleh verify any such provenance.

78. Dr. Saleh's response neither verified nor contradicted the provenance provided by Phoenix.

79. Dr. Saleh's response merely suggested that the Museum contact an American museum that collects such objects in order to address its question.

80. On information and belief, the Museum made no such inquiries.

81. As such, the Museum either knew or was willfully blind to the fact that Phoenix's purported provenance was fictional at the time the Mask was imported.

82. At the time it imported the Mask into the United States, the Museum was aware of the controlling provisions of Egyptian law, including, without limitation, that, subject to limited exceptions, any artifact excavated after 1951 was the property of the Republic of Egypt and that the export of any such item from Egypt required that a license be obtained.

83. At the time it imported the Mask into the United States, the Museum either knew or

was willfully blind to the fact that no such license existed.

84. At the time it imported the Mask into the United States, the Museum either knew or was willfully blind to the fact that none of the conditions for private ownership of the Mask under Egyptian law had been satisfied.

85. At the time it imported the Mask into the United States, the Museum either knew or was willfully blind to the fact that Egypt was the true owner of the Mask.

86. At the time it imported the Mask into the United States, the Museum either knew or was willfully blind to the fact that the Mask had been stolen from Egypt.

*Discovery by the Republic of Egypt*

87. In or around 2006, the Egyptian Supreme Council of Antiquities became aware that the Mask had been accessioned by the Saint Louis Art Museum in 1998.

88. Subsequently, the Secretary General for the Egyptian Supreme Council of Antiquities sent letters and documentation to the Saint Louis Art Museum detailing the history of the Mask and requesting its return to Egypt.

89. The communications from the Supreme Council of Antiquities indicated to the Museum that the Republic of Egypt was in continuous possession of the Mask from its excavation through at least 1966.

90. At the time it received documentation from the Supreme Council of Antiquities indicating that the Mask remained in the continuous possession of the Republic of Egypt through at least 1966, it was known to the Museum that the provenance provided to it by Phoenix was false.

91. At no time did the Museum have any evidence to suggest that the Republic of Egypt had ever given or sold the Mask to a private party as authorized under Law No. 215.

92. At no time did the Museum have any evidence to suggest that the Mask was lawfully exported from Egypt.

93. At the time that it received documentation from the Supreme Council of Antiquities indicating that the Mask remained in the continuous possession of the Republic of Egypt as late as 1966, the Museum either knew or was willfully blind to the fact that the Mask had been stolen from Egypt.

94. To date, the Saint Louis Art Museum has refused to return the Mask.

95. The Mask currently in the possession of the St. Louis Art Museum is the same Mask described in paragraphs 16 through 23.

96. The Mask's market value at all relevant times exceeded $50,000.00.

## Claim

### *Count I – Forfeiture Under 19 U.S.C. § 1595a*

97. Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

98. Section 1595a(c) of Title 19 provides that "[m]erchandise which is introduced or attempted to be introduced into the United States contrary to law . . . shall be seized and forfeited if it . . . is stolen, smuggled, or clandestinely imported or introduced."

99. To the extent that it is necessary to independently establish the existence of a predicate offense in order for the importation of the Mask to be considered "contrary to law," the importation of the Mask violated one or more of the following:

a. 19 U.S.C. § 1595a, which provides that any merchandise that is "stolen, smuggled, or clandestinely imported or introduced" is subject to forfeiture;

b. 18 U.S.C. § 545, which provides that "[w]hoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law" shall be subject to penalty;

c. 18 U.S.C. § 2314, which provides that "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any . . . merchandise . . . of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud" shall be subject to penalty;

d. 18 U.S.C. § 2315, which provides that "[w]hoever receives, possesses, conceals, stores, barters, sells, or disposes of any . . . merchandise . . . of the value of $5,000 or more . . . which [has] crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken" shall be subject to penalty.

e. Egyptian law, including Law No. 215 and Decree No. 10614, which provide that antiquities like the Mask are the property of Egypt and not subject to private ownership except in limited circumstances not obtaining in the instant case, and that the unlicensed export or appropriation of such antiquities is a criminal offense;

f. the common law of property, title, and torts, which provide that a thief cannot pass good title, and that one who receives possession of property from another who lacks the power to pass title is liable for conversion;

g. the laws of Missouri, including Mo. Rev. Stat. § 570.080, which provides that a person "commits the crime of receiving stolen property if for the purpose of depriving the owner of a lawful interest therein, he or she receives, retains, or disposes of property of another knowing that it has been stolen, or believing that it has been stolen";

h. the laws of New York, including N.Y. Penal Law §§ 165.52 and 165.55, which together provide that a person "is guilty of criminal possession of stolen property in the second degree when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof, and when the value of the property exceeds fifty thousand dollars," and that "a person in the business of buying, selling, or

> otherwise dealing in property who possesses stolen property is presumed to know that such property is stolen if he obtained it without having ascertained by reasonable inquiry that the person from whom he obtained it had a legal right to possess it."

100. The defendant Mask is subject to forfeiture pursuant to 19 U.S.C. § 1595a because it was stolen, smuggled, or clandestinely imported and introduced into the United States contrary to law.

WHEREFORE the United States prays that this Court decree that any other right, title, and interest in the defendant property be condemned and forfeited to the United States of America, and for such other and further relief as the Court deems just and proper.

Dated: June 8, 2012                     Respectfully submitted,

                                        RICHARD G. CALLAHAN
                                        United States Attorney

                                         /s/ Richard E. Finneran
                                        RICHARD E. FINNERAN, #60768MO
                                        Assistant United States Attorney
                                        111 South 10th Street, Suite 20.333
                                        Saint Louis, Missouri 63102
                                        Telephone:  (314) 539-2200
                                        Facsimile:  (314) 539-2287
                                        *richard.finneran@usdoj.gov*

## VERIFICATION

I, Special Agent A. Dewayne House, hereby verify and declare under penalty of perjury that I am a Special Agent with United States Immigration and Customs Enforcement, that I have read the foregoing Verified Complaint and know the contents thereof, and that the factual allegations contained in the Verified Complaint are true to my own knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with United States Immigration and Customs Enforcement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____
             (date)

_____
A. Dewayne House
Special Agent
United States Immigration and Customs Enforcement

**Exhibit 1**



**Exhibit 2**

